1

```
 1              IN THE UNITED STATES DISTRICT COURT        United States District Court
                   SOUTHERN DISTRICT OF TEXAS               Southern District of Texas
 2                     BROWNSVILLE DIVISION                          FILED

 3        _____)                    MAR 0 7 2005
          ANTELMA DOMINGUEZ-PEREZ       )
 4                                      )                Michael N. Milby, Clerk of Court
                                        )
          VS.                           ) CIVIL ACTION NO.
 5                                      ) B-96-116
                                        )
 6        TOM RIDGE, ET AL              )
                                        )
 7        _____)

 8

 9                         MOTION HEARING
               BEFORE THE HONORABLE ANDREW S. HANEN
10                     SEPTEMBER 21, 2004

11        APPEARANCES:

12        For the Plaintiff:        MS. LISA BRODYAGA
                                    Refugio Del Rio Grande
13                                  17891 Landrum Park Road
                                    San Benito, Texas  78586
14

15        For the Plaintiff:        MR. JAVIER N. MALDONADO
                                    Texas Lawyers' Committee for Civil
16                                  Rights Under Law
                                    118 Broadway, Suite 302
17                                  San Antonio, Texas  78205

18        For the Defendant:        MR. ERNESTO H. MOLINA, JR.
                                    Office of Immigration Litigation
19                                  Civil Division
                                    P.O. Box 878 Ben Franklin Station
20                                  Washington, D.C.  20044

21        Transcribed by:           BARBARA BARNARD
                                    Official Court Reporter
22                                  600 E. Harrison, Box 301
                                    Brownsville, Texas  78520
23                                  (956)548-2591

24

25
```

# CERTIFIED COPY

 1          THE COURT:  This is Judge Hanen.  Who's on the line?

 2          MR. MALDONADO:  Javier Maldonado for the plaintiffs,

 3     co-counsel.

 4          THE COURT:  All right.

 5          MR. MOLINA:  And Ernesto Molina for the government.

 6          THE COURT:  All right.  This is Judge Hanen, and I'm

 7     here in my conference room.  You're on the record.  I'm here

 8     with my staff, and Ms. Brodyaga is with me.

 9          And this is 96-116, just for the record, Dominguez-Perez

10     versus Ridge.  I guess it was originally Dominguez-Perez versus

11     Janet Reno at one point in time.

12          And as y'all know, with Judge Vela's passing, I inherited

13     all his cases, and this is one of the cases I've inherited.  And

14     looking at this case, while there are some motions pending, you

15     know, I briefly have reviewed it.  I've reviewed the ruling.  I

16     guess what I'm wondering, it seems to me that one of the

17     purposes of more or less holding this case in abeyance was for

18     the parties to get together and try to agree on an order that

19     everybody could live with.  And tell me the status of that.

20          Why don't I start with you, Mr. Molina.  Tell me the status

21     of that.

22          MR. MOLINA:  Well, Your Honor, the parties had discussed

23     it, but we were unable to reach an agreement.

24          THE COURT:  Was there a particular sticking point?

25          MR. MOLINA:  Only in terms -- I think there was really

1    only one particular sticking point, as I recall, and that was a

2    very particular time period.

3            THE COURT:  You mean how quickly things had to be done?

4            MR. MOLINA:  Yes, Your Honor.  Just for your -- just to

5    remind Your Honor, there was sought in this case his employment

6    authorization.  And under regulations as they presently stand,

7    there are two time periods for employment authorizations.  One

8    time period applies to asylum applicants who, I believe, can get

9    work authorization after 90 days.  The other applies to other

10   types of employment authorized aliens.  I think they have to

11   wait 120 days, if I recall.  The sticking point was which set

12   of -- which days should be applied, which time limits should be

13   applied.

14           THE COURT:  Okay.  And from your position, is that the

15   only difference?  Because that seems, in the grand scheme of

16   things, kind of a small difference.

17           MR. MOLINA:  Well, that is a small difference, Your

18   Honor, and I believe -- as my -- according to what I remember of

19   the case, that was really it.

20           THE COURT:  Well, let me switch over and talk to

21   Ms. Brodyaga.  Ms. Brodyaga, why don't you -- where do you

22   remember things being?

23           MS. BRODYAGA:  I also agree, Judge, that the question

24   was a question of time.  Our position -- I disagree with

25   Mr. Molina as to his factual basis, the -- in fact, the

1    regulations require that all applicants for employment

2    authorization or all applications, if they are not adjudicated

3    within 90 days, the government must give a provisional

4    employment authorization.

5        The government wanted a -- what we considered to be a much

6    longer time frame for this.  There have been no problems in the

7    past with the -- with the implementation of the current order,

8    with a very brief exception when there were new people in

9    Harlingen, and they have all been done well within the 90 day

10   time frame, and we don't see why this group of people should be

11   treated differently from other groups.

12       The difference with asylum applicants is that they are not

13   eligible to apply for employment authorization until five months

14   after they have applied for asylum, and then only if their

15   application for asylum has not been finally adjudicated within

16   that period of time.  But once they are eligible to apply for

17   employment authorization, they are treated equally with all

18   other classes of applicants in that if the application is not

19   adjudicated within 90 days, they are entitled to provisional

20   authorization until such time as it is adjudicated.

21           THE COURT:  All right.  Mr. Maldonado, do you agree with

22   Ms. Brodyaga's position?

23           MR. MALDONADO:  I do, Your Honor.

24           THE COURT:  Okay.  Mr. Molina, what's wrong with 90

25   days?  Tell me why that doesn't work.

1          MR. MOLINA:  Well, Your Honor, the government is very

2     careful about who it gives employment authorization to.  The

3     reason that the 90-day period is given to asylum applicants is

4     because, quite literally, they have nowhere else to go to get

5     work authorization.  In this case, people who filed claims or

6     who file requests for certificates of citizenship, these are

7     people who claim to be United States citizens and who, by the

8     time they have applied, have already had four to five other

9     means by which they could obtain proof of work authorization.

10    It includes Social Security cards, passports, and other

11    identification that would get -- which would be sufficient proof

12    of work authorization.

13         Now, I still have to disagree with the way Ms. Brodyaga has

14    framed it in that I -- if my recollection is correct, other

15    employment authorization people, I'll call them aliens, have to

16    wait 120 days before they can get a temporary authorization, and

17    I, of course, would want to check on that again.  But my

18    understanding was that that was the last limitation that we were

19    under, was whether to treat them under the 90 days or under the

20    120 days.  And because these people have other means of

21    obtaining proof of work authorization, the government was in

22    favor of the 120 day limitation.

23         THE COURT:  What other means do they have?  Tell me that

24    again.

25         MR. MOLINA:  Well, under the regulations, Your Honor,

1　proof of work authorization can be shown by a Social Security

2　card.

3　　　　　　THE COURT:  Okay.  But I -- now, that's where I was

4　having problems.  I understood these people couldn't get a

5　Social Security card; that that was one of the problems with the

6　lawsuit.

7　　　　　　MR. MOLINA:  Well, that's true in some respects, Your

8　Honor, but untrue in other respects.  For example, a passport is

9　another document.  And, of course, the passport is also good to

10　get you the Social Security card.

11　　　　　　THE COURT:  Okay.  But if you're -- can you get a United

12　States passport if you haven't had approved United States

13　citizenship?  I mean, it sounds to me like --

14　　　　　　MR. MOLINA:  These folks are not looking for proof of

15　United States' citizenship, Your Honor.  What they are looking

16　for is work authorization.  Now, they claim to have been born

17　United States' citizens.  They are allowed to make that claim

18　before, for example, the State Department in the process of

19　getting a passport.

20　　　　　　THE COURT:  Okay.

21　　　　　　MR. MOLINA:  Most of these folks have been able to get a

22　passport literally all their lives.

23　　　　　　THE COURT:  Okay.  But whose country is the passport

24　from?

25　　　　　　MR. MOLINA:  It would be a United States' passport, Your

1    Honor.

2              THE COURT:  Okay.

3              MR. MOLINA:  These are folks who claim to already be

4    United States' citizens by birth, which means they are entitled

5    to a passport upon an appropriate showing to the State

6    Department.  There are also ways that they can get passports

7    while they're abroad in Mexico, for example, at United States

8    Embassies, by making that showing to an appropriate state

9    department official.  So these are folks -- they're not folks

10   who have been without some type of recourse.

11             THE COURT:  Well, what's -- let me -- what's wrong --

12   and I don't mean to cut you off, but what's wrong with having a

13   90-day time period; and then if you -- if there's an emergency

14   situation that comes up, you can apply to the court for an

15   extension?  I mean, in the five years that we've been under this

16   order -- well, it's not been five years, but the lawsuit has

17   been going on for five years at least.  When was the order

18   entered?

19             MS. BRODYAGA:  February 26, '96.  '99, excuse me.

20             THE COURT:  Well, it has been five years.

21       In the five years, you've had no problem complying with it,

22   and why can't we have the -- why can't y'all reach an agreement

23   with an order that basically has the 90-day provision, but that

24   has an emergency provision?  I mean, because I can see some

25   circumstances such as 9/11 or, you know, some extrinsic things

1    happening that would cause a delay.  And I'm not saying that --

2    that the -- you know, all delays wouldn't be -- I mean, all

3    delays would be approved, but -- I mean, but there are some

4    circumstances where I think everybody would agree that you're

5    doing the best you can, and there's an emergency that's going on

6    in the country.  I mean, why can't we draft an agreed order that

7    kind of falls into that category?

8        MR. MOLINA:  Well, that type of a provision had not been

9    discussed, Your Honor, and I can easily take that to my client.

10   What I do know my client's concerns are is that they don't want

11   to have to go back to the court every time and bother the court

12   with any little matter that --

13       THE COURT:  And I don't want to be bothered with every

14   little matter.  But I'm talking about, you know, look, we have

15   kind of a crisis going on.  You know, we have some -- you know,

16   9/11 is the thing that comes to mind immediately where all of a

17   sudden, hey, you know, we need to reevaluate what we're doing

18   and -- and I don't want to be in the business of approving work

19   authorizations.  I mean, that's not in my job description, and I

20   don't want it to be.  I want it to be, you know, the people who

21   are experts in doing such a thing to do it.  But there ought to

22   be a way that they can do it expeditiously and not hamper these

23   people that are out there trying to work and support themselves.

24       MR. MOLINA:  Well, in that regard, Your Honor, the

25   government agrees that we don't want the court to be

1  unnecessarily involved.  That's why the 59E motion that we had

2  drafted just suggests that the court leave it up to the agency

3  to craft something in compliance with the court's order.

4       THE COURT:  Well, I guess the problem with that is if --

5  and I don't want to speak for the plaintiffs; but, I mean, it

6  was left up to the agency the first time, and they came up with

7  an order that violated equal protection rights of the people, so

8  I think they're maybe a little concerned about just blanketly

9  leaving it up to the agency.

10      MR. MOLINA:  Well, that's not exactly true, Your Honor.

11  Traditionally in equal protection cases when there is a

12  violation shown, it is usually instructed the government do

13  something to put everything in compliance with equal protection.

14  Now, courts usually don't tell the agency exactly what to do

15  merely to fix the problem.  For example, in *Frances versus INS*

16  when there was an equal protection violation there -- that's a

17  case out of the 2nd Circuit -- the 2nd Circuit remanded to the

18  agency not saying that the government had to make 212C relief

19  available to any particular group of aliens, but merely to

20  correct the equal protection violation.

21      THE COURT:  Well, let me do --

22      MR. MOLINA:  Now, in this case, that would involve one

23  of two possibilities.  Either the government can eliminate

24  temporary work authorizations all together, which eliminates the

25  equal protection violation; or what the agency is more

```
1    interested in doing is providing a more generalized structure
2    for how these things can work, and that was one of the things
3    discussed in negotiations.  We forwarded some proposed
4    regulations that the agency was considering filing.  Now that I
5    think I recall, I think that's where the 90 versus 120 period
6    might have come into play.
7         THE COURT:  All right.  Well, let me ask the plaintiffs
8    then, either Mr. Maldonado or Ms. Brodyaga, what's wrong with
9    having a provision -- let's say I'm inclined to go with 90 days.
10   What's wrong with, though, having -- the agency having a -- you
11   know, a provision where if something comes up where they've got,
12   you know, an emergency manpower shortage or -- and I'm not
13   talking about regular course of business.  I'm talking about
14   something where they'd have to -- you know, there's an obvious
15   need to treat this time period differently.  I mean, is there --
16   what's wrong with that?
17        MS. BRODYAGA:  May I be heard, Judge?
18        THE COURT:  Yeah.
19        MS. BRODYAGA:  We attempted to take that into
20   consideration in our amended final order which we have sent to
21   the government a year ago where we discuss it on the basis of
22   being on the same time frame and in the same manner as other
23   applications for employment authorization.  If there were such
24   an emergency, we anticipate it would affect all applicants and,
25   therefore, the government would be in a position to, on its own,
```

1  do whatever it needed to do, and that would be consistent with

2  the equal protection argument; that if other people can't get

3  them because there is another such crisis, then these people

4  also cannot get them.  And we think that that would adequately

5  address, you know, that issue without requiring them to come

6  back to the court.

7       But if -- you know, we have no objection to leaving some

8  sort of escape for them on that issue or on whatever other

9  things come up, and that includes the potential fraud problem.

10  And, in fact, in the -- the government has been reviewing these

11  cases for prima facia eligibility prior to issuing the

12  documents, and they have had apparently no problem with that.

13  In fact, they said this is occurring within the 90 days, and

14  there has been no problem with that.  And I think if Mr. Molina

15  checks his regulations, he will find that 90 days is, in fact,

16  the time frame.  And if it is not, that would be covered by our

17  amended final order, which talks about the same time frame and

18  same manner as other applicants.  If he were correct, then it

19  would be 120 days rather than the 90 in our proposed amended

20  order.

21       THE COURT:  Well, I guess hearing that, and, Mr. Molina,

22  hearing you, I mean, I just can't see why we don't have an

23  agreement here.  I mean, and it may be that the case had left

24  dormant and everybody has gotten a little stale on it; and

25  obviously, I'm brand new to it, so I know the least about this

1   than anybody here.  But it sounds like to me that you -- you

2   know, just sitting here talking to all three of y'all, that you

3   basically have an agreement if -- you know, that, Mr. Molina,

4   you're agreeing that the individuals ought to be treated the

5   same as everybody else.  Isn't that right?

6           MR. MOLINA:  I'm saying that the government is urging

7   that if the court does issue an order against the government, it

8   should be only to the affect of these folks should be treated,

9   you know, like others, yes.

10          THE COURT:  Okay.  Well, I think I'm hearing that's all

11  the plaintiffs want.

12          MR. MOLINA:  Well, but, you see, that's part of the

13  problem that we were -- the government was trying to address in

14  the regulations, Your Honor.  I'm sorry.  I didn't mean to cut

15  you off.  But the government is on the brink of issuing some

16  regulations; and the regulations, as I now recall them, do

17  distinguish between a 90-day period for some folks and 120-day

18  period for other folks.  Now, the plaintiffs wanted these aliens

19  treated under the 90-day provision, but the government's present

20  scheme, I think, has them treated under a 120-day period.

21      That raises concern for the government if there is any type

22  of an order from the court other than one saying, you know, the

23  government is to provide work authorizations to these folks in

24  the manner afforded to other aliens.

25          THE COURT:  Well, why do they treat some with 90?  I

1    don't understand the distinction.  Why the difference?

2         MR. MOLINA:  Well, because the government would probably

3    rather have 120-day period, Your Honor, as being the actual time

4    frame.  This gives the government more time.

5         THE COURT:  Well, I understand that.  Then why don't

6    they make all the rules 120 days?

7         MR. MOLINA:  Because they're also trying to accommodate

8    an extraordinary circumstance, Your Honor, which are people who

9    are seeking asylum who have no other means of helping themselves

10   while they're in this country seeking asylum.  That's kind of an

11   extraordinary circumstance that the government is trying to be

12   merciful to an area where they see mercy is required, but still

13   fulfill its obligations to be fairly thorough in the checks it

14   makes.  So it's a compromise that the government is interested

15   in.

16        MS. BRODYAGA:  May I be heard?

17        MR. MOLINA:  Especially after 9/11 when there's a lot

18   more documentation to be gone through, et cetera.  Time periods

19   has to extend, but mercy still needs to be extended to those who

20   need the mercy.

21        THE COURT:  Well, I guess I understand, and I didn't

22   mean to cut you off, Ms. Brodyaga.  I understand the argument

23   for that; but, I mean, these same people, I mean, there's no

24   difference between someone seeking asylum who's starving because

25   they can't get a job and someone who is seeking citizenship and

1    starving because they can't get a job.  I mean, I don't see the

2    distinction.

3          MR. MOLINA:  Well, the distinction is that those who are

4    United States' citizens and haven't had the work authorization

5    have had, again, multiple opportunities their entire lives to

6    obtain that type of work authorization; and, therefore, they

7    have had other outlets.  Whereas, you know, the asylum applicant

8    is usually well outside any opportunity or ever having had any

9    opportunity.  Therefore, they're in the greater need of that

10   mercy, that benefit.

11         THE COURT:  Okay.  Ms. Brodyaga?

12         MS. BRODYAGA:  Two points, Judge.  First of all, most of

13   the people applying for certificates of citizenship were not

14   aware that they were eligible for such a benefit until they

15   spoke with counsel in the United States.

16       And secondly, if the government were truly trying to be

17   merciful to asylum applicants, they would cut out that first

18   five-month period that they have to wait before they can even

19   apply for employment authorization.  So in effect as it is now,

20   asylum applicants are required to wait at least eight months

21   before they can get employment authorization, and I don't

22   consider that particularly merciful.

23       And all we are asking is that the -- these applicants be

24   treated on the same footing as people, for example, who are

25   applying for adjustment of status, which is where this came

1    about in the first place.  Our lead plaintiff and her husband

2    were both applying for benefits.  Her husband was applying for

3    adjustment of status on the basis of the fact that the lead

4    plaintiff is a U.S. citizen, and he was able to get employment

5    authorization on the basis of her claim to citizenship when she

6    could not get it in her own name.  And that's where this case

7    arose, and that's where the equal protection violation came

8    from.  And we consider that in order to rectify the situation,

9    the citizen claimant should be enabled to get employment

10    authorization within the same time frame as somebody who is

11    getting authorization through her.

12        THE COURT:  Well, let me ask you, Ms. Brodyaga.  And,

13    Mr. Maldonado, why can't the government treat someone who's

14    seeking asylum differently?  I mean --

15        MR. MALDONADO:  Why can't they?

16        THE COURT:  Yeah, why cannot they?  Why can't they have

17    a one rule for asylum seekers, which is theoretically an

18    emergency situation that exists in certain countries that allow

19    somebody to -- who otherwise wouldn't be able to immigrate, to

20    come in and immigrate, why can't they be treated differently

21    than other people?  I mean, why can't we have a 90-day rule for

22    one and 120-day rule for the other?  Assuming we have 120-day

23    rule for everybody else.

24        Now, see, I don't -- I don't necessarily see a distinction

25    between the example that we just had from the lead plaintiffs

1  where you have, one, a resident alien; and, two, a -- a person

2  that's applying for citizenship or applying for her permit based

3  on her citizenship.  But, I mean, I can see where the government

4  could make a case that people claiming asylum, that's a

5  different animal.

6      MR. MALDONADO:  Your Honor, honestly off the top of my

7  head, I don't have an answer to it.  But I think -- and, Lisa,

8  if you could correct me on this.  It's not as if the filing of

9  the application for work is resolved -- that the government is

10 issuing them upon filing of the application.  They have 90 days.

11 And even after those 90 days, an interim work permit is given to

12 the applicant so that at any point, the government can revoke or

13 rescind this authorization if they believe there was some error

14 or fraud or whatever it might be.

15   So in some respects, I think this 90, 120 day that the

16 government is trying to make, this distinction, is -- I don't

17 think is compelling.

18      MS. BRODYAGA:  Again, Judge, may I?

19      THE COURT:  Uh-huh.

20      MS. BRODYAGA:  Judge, the -- it sounds to me as if the

21 government is planning to issue regulations which would change

22 the current time frame for other types of applicants from 90

23 days to 120 days.  Mr. Molina seems to be under the impression

24 that that is already the case, but I assure him it is not.

25 Under the regulations, it is currently 90 days for all

1  applicants, including asylum and adjustment of status.

2      The way we have formulated the amended final order, should

3  the government change it for, say, adjustment applicants from 90

4  to 120 days, that would -- these people would ride with them

5  because we are asking that they be treated equally with other

6  applicants.

7      I would have no objection to allowing asylum applicants to

8  be treated differently.  They already are treated differently

9  because they are not entitled to make their application until

10  five months have passed after they have applied for asylum.  So

11  if the government wants to shorten the period after that in

12  which they are required to wait, I have -- I certainly have no

13  objection to that.  It is primarily with people such as

14  adjustment applicants that we are insisting on equal treatment

15  because that's where the equal protection violation came in in

16  the first place.

17      THE COURT:  How about that, Mr. Molina?  Does that cure

18  your problem?

19      MR. MOLINA:  That would largely cure the problem, Your

20  Honor.  But, of course, I just want to make sure that all this

21  will be fine -- would be fine with my client.

22      THE COURT:  Why don't we do this.  Let's -- today is the

23  21st.  Let's get together.  And you can do this by phone; and

24  Ms. Brodyaga, if you want to, you can do it by phone, or you're

25  welcome to come down here.  What do we have?  Looks like we have

1    nothing on the 4th.

2         COURT CLERK:  No, sir.

3         THE COURT:  Let's do it by phone at 10:00 o'clock on the

4    4th.  And in this intervening two weeks, why don't y'all get

5    together and see if you can agree.  One, Mr. Molina, you see if

6    your client is on board.  And, two, get together with

7    Mr. Maldonado and Ms. Brodyaga and see if you can agree on an

8    order.  Because, I mean, it just seems like we're on the verge

9    here of everyone agreeing, and I think everyone agrees we

10   shouldn't violate the constitution.  At least I hope we all

11   agree to that.  So this is something that ought to be able to

12   resolve itself.

13        MR. MOLINA:  Certainly, Your Honor.

14        THE COURT:  Okay.  And --

15        MR. MALDONADO:  Your Honor, is this October 4th?

16        THE COURT:  Yes.

17        MR. MALDONADO:  Okay.

18        THE COURT:  All right.  So I guess technically I'm going

19   to deny the motion -- the plaintiff's motion to hold the case --

20   to lift the order holding it in abeyance, because I'm holding it

21   in abeyance for another two weeks.

22        MR. MOLINA:  Okay.

23        THE COURT:  But let's see if we can get together.

24   This -- this is semi-frustrating to me because it seems like

25   we're so close that everybody -- I mean, I know I'm talking like

```
 1    a mediator, but we're right here where, I mean, I think

 2    everybody agrees in principle and that we ought to be able to do

 3    this.

 4         So, Mr. Molina, check with your client.  Let's see if we can

 5    get an agreed order here, and we can wrap this up.  And I can

 6    assure you that I have no desire whatsoever to be running the

 7    Immigration Service, and you can assure your client that it's

 8    the last thing the judge wants to do.

 9              MR. MOLINA:  Absolutely, Your Honor.

10              THE COURT:  I can barely run my court.  And so that's --

11    I have enough to say grace over right now, okay?

12              MR. MOLINA:  Certainly, Your Honor.

13              THE COURT:  But at the same time, I'd like to get --

14    there ought to be a reasonable accommodation here to resolve

15    this issue, all right?

16              MR. MOLINA:  Okay.

17              THE COURT:  All right.  Anything else we need to do?

18         All right.  We're going to get together on the 4th -- did I

19    give a time?

20              MS. BRODYAGA:  10:00 o'clock.

21              THE COURT:  10:00 o'clock.  Who set up this conference

22    call?

23              COURT CLERK:  Mr. Maldonado's office.

24              THE COURT:  Mr. Maldonado, can you do it again?

25              MR. MALDONADO:  Yes, Your Honor.
```

1      THE COURT:  And visit with Ms. Brodyaga about whether

2  she'd rather appear by phone or appear down here at the

3  courthouse.

4      MR. MALDONADO:  Yes Your Honor.

5      THE COURT:  All right.  Thank you, counsel.

6      MR. MOLINA:  Thank you, Your Honor.

7                        * * *

8      (End of requested transcript)

9                        -oOo-

10   I certify that the foregoing is a correct transcript from

11 the record of proceedings in the above matter.

12

13 Date:  March 7, 2005

14

15

16                    Signature of Court Reporter
                       Barbara Barnard
17

18

19

20

21

22

23

24

25